HARDWARE MUTUAL CASUALTY
COMPANY, Appellee,

v.

Bewayne JONES, Infant, and Louis Jones,
Appellants.

No. 10035.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 10, 1965.

Decided June 16, 1966.

J. Randolph Davis and Robert F. Boyd, Norfolk, Va. (Davis & Boyd, Norfolk, Va., on brief), for appellants.

Terry H. Davis, Jr., Norfolk, Va. (Taylor, Gustin, Harris, Fears & Davis, Norfolk, Va., on brief), for appellee.

Before SOBELOFF and BOREMAN, Circuit Judges, and MAXWELL, District Judge.

MAXWELL, District Judge.

The controversy presently before the Court was the subject of an earlier opinion, reported as Hardware Mutual Casualty Company, Appellant v. Jones and Jones, Appellees, 330 F.2d 1014 (1964). The opinion on that appeal reversed and remanded for a new trial. A new trial was subsequently held in the District Court, and upon a jury verdict and judgment in favor of Hardware Mutual Casualty Company, Bewayne Jones and Louis Jones now present the controversy for the second time to this Court.

Appellants on this second appeal raise four questions:

1. Did the Court err in its main charge and supplemental charge to the jury on permission or consent, express or implied?

2. Did the Court err in submitting to the jury any issue of fact as to whether the 1947 Pontiac automobile was used principally in the operation of the business of the dealer, Phillips Brothers, employer of Heckstall?

3. Did the Court err in submitting to the jury as an issue of fact whether or not Womack intended to loan dealer tags to Heckstall as a buyer?

4. Did the Court err in denying Jones' motion for a directed verdict in their favor against Hardware?

In summary, after a review of the entire record presented on this second appeal, we conclude that each of the questions presented by Appellants herein must be answered in the negative.

The record before us from the second trial of this matter in the District Court reflects that on March 1, 1961, Hardware Mutual Casualty Company issued an automobile garage liability insurance policy to "Automoville, Inc., Tench H. Phillips, Jr., Tench H. Phillips & G. Connolly Phillips, d/b/a Phillips Bros. Automoville," 7100 Military Highway, Norfolk, Virginia. The named insureds were engaged in the new and used automobile business. Their used car place of business was at Little Creek Road, also in Norfolk, Virginia.

The applicable parts of the policy require payment on behalf of the insured for all sums which he becomes legally obligated to pay by reason of "the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations." The policy defines an insured as "any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission." [1]

Phillips Bros. Automoville employed Elbert L. Heckstall as a lot boy to clean, wash and recondition cars for sale, and his employment was at the used car lot. He had been so employed for a period of about three years.

[1] "Division 1. Premises—Operations—Automobiles. "The ownership, maintenance or use of the premises for the purpose of an automobile sales agency, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, and executive officer thereof, or a member of the household of any such person."
"Definition of insured.
"With respect to the insurance under coverages A, B and D the unqualified word 'insured' includes the named insured and also include (1) any partner, employee, director or stockholder thereof while acting within the scope of his duties as such, and any person or organization having any financial interest in the business of the named insured covered by this policy, and (2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

In August, 1960, Phillips Bros. Automoville obtained by trade-in a 1947 Pontiac automobile. The car was on the used car lot and Heckstall indicated an interest in buying it. Tench Phillips, an officer of the company, agreed to sell the car to Heckstall for a price of either fifty dollars or eighty dollars, the testimony on this point being confused, and Heckstall was to pay ten dollars a week on the car until paid in full. There was some testimony that the installment payments were to be five dollars a week. The total amount actually paid on the car, however, was twenty dollars. Tench Phillips loaned Heckstall his dealer license plates to enable Heckstall to take the car home to "do some work on it." The certificate of title for the automobile was not delivered to Heckstall at the time of the delivery of the automobile to him. According to the record, it was assumed that some mechanical work, installing seat covers or polishing the car, was the purpose of Heckstall taking the car from the used car lot to his home.

There is no question in the record of this case that selling cars is within the scope of the business of Phillips Bros. Automoville, and it appears from the record that on at least four occasions Tench Phillips loaned his dealer license plates to Heckstall to enable Heckstall to use the Pontiac automobile. There is testimony in the record of this case that the car had been in the possession of Heckstall for three months, and there is also testimony that the car had been in Heckstall's possession for about nine months. The car was carried on the car inventory of Phillips Bros. Automoville as a car for sale during the entire period. There is also in the record evidence that the price of the automobile was carried as an account receivable on the books at Phillips Bros. Automoville.

On the evening of June 7, 1961, Heckstall was not working because he had earlier injured his leg. Tench Phillips was out of the state and Connolly Phillips was likewise absent from the place of employment. Robert Womack, as a company salesman, was at the Little Creek Road office used car lot. Between five-thirty to six o'clock p. m. Heckstall went to the Little Creek lot and asked Mr. Womack for the use of dealer license plates for the Pontiac automobile. From the testimony of Heckstall, it appears that the transaction concerning the borrowing of these dealer license plates was as follows:

Q. You asked him to loan you the tags to use on your car?

A. Yes, sir.

Q. What did he do?

A. Pointed on the floor to the tags.

(The record at another point indicates that Womack at the time of this inquiry was preoccupied, talking with a customer.)

Q. Tags laying on the floor right by him?

A. Yes, sir.

Q. You picked them up and went out with them?

A. Yes, sir.

Q. You took them home, right, and put them on the 1947 Pontiac automobile the same day, June 17?

A. I don't quite remember that, sir.

Q. Well, do you recall having this accident?

A. Yes, sir, I remember that.

Q. The tag was on the car?

A. Yes, sir.

Q. At the time of the accident?

A. Yes, sir.

On the same evening, June 17, 1961, Heckstall took the Pontiac automobile out on the highway, ran off the road and struck Bewayne Jones, a fourteen year old boy.

Heckstall, at the time of the accident with Bewayne Jones, was an employee of Phillips Bros. Automoville, and the automobile which he was driving was titled in the name of Phillips Bros., and had Phillips Bros. dealer's tags on it. There is no contention, by any of the parties herein, that Heckstall was acting

**630**

within the scope of his employment at the time of the accident.

Hardware Mutual Casualty Company brought a declaratory judgment action to have a court determination as to whether or not it was obligated under the garage liability insurance policy to pay a judgment of $30,000.00 obtained by Bewayne Jones, the infant, and a judgment of $15,000.00 obtained by Louis Jones, both of which judgments were against Elbert L. Heckstall and were from the Court of Law and Chancery of the City of Norfolk, entered on April 17, 1962, as damages for personal injuries, for medical expenses and loss of services. The Joneses each filed a counterclaim for affirmative relief, seeking judgments against Hardware Mutual Casualty Company.

Looking to the first contention of Appellant, that the Court committed error in its main charge and supplemental charge to the jury on the question of permission, expressed or implied, it is pertinent that we look to the charge given by the District Court on this issue, and which is as follows:

"Let's first take up the question of expressed consent. The Joneses contend that Mr. Womack gave express consent. Hardware Mutual, on the other hand, contends that he did not. In order to determine whether Mr. Womack gave express consent, you must first determine whether he had authority to permit Mr. Heckstall to use the tags. Mr. Womack had authority to permit a buyer to use the tags, that is an uncontradicted fact in the case. If the jury believes that he intended to permit Mr. Heckstall, as a buyer, to use these tags, then he had authority to grant the use. Mr. Womack, however, did not have authority to permit Mr. Heckstall, as an employee, to use the tags for his personal use, and if you believe that he intended to permit Mr. Heckstall, as an employee, to use the tags for his personal use, he did not have authority to do so. After you have determined whether Mr. Womack had authority,

you must next determine whether Mr. Womack permitted Mr. Heckstall to use these tags on the 1947 Pontiac, or whether he permitted him to use—or whether he permitted Mr. Heckstall to use the tags only to move company cars. If you find that Mr. Womack did not have authority or if you find that, although he had authority he did not give consent for use on the 1947 Pontiac, then there was no express consent from Mr. Womack to use the car. If you find he had authority to and did give consent for use on the 1947 Pontiac, then there was express consent."

The supplemental charge, which is brought into controversy by Appellants, came after the jury had retired, and subsequently returned into court asking for further instruction, as to implied consent and also express consent. The Court then instructed the jury as follows:

"Implied permission or consent to use a car arises from a course of conduct or relationship between the parties in which there is a mutual acquiescence or lack of objection under circumstances signifying a consent to the use of the car. Of course, in order for the permission or consent to be implied, the owners would have to know of the general use. You must understand, however, that permission for a specific purpose only does not create an implied permission for other unrelated purposes. As a corollary to the rule I have just stated, if you find there was a general implied permission for Mr. Heckstall to use this car, the fact that Phillipses were out of town at the time of the accident would not revoke the implied permission. Of course, I use the word owners in the sense that Phillips brothers were doing business as Automobilles, Incorporated, as their agents, their officers. Express permission or consent is an explicit granting, a clear, unambiguous, that would be by words, either verbally spoken or in writing, but express consent could be certainly given with unambiguous, unequivocal meaning;

for example, if I asked the man if I could use his fountain pen, he could say, yes, he could write, yes, or he could just hand me the fountain pen. I would have consent to use it. It would be so implied. It would be different from the implied consent where I would be using the fountain pen over a long course of time and just went on using it."

■ Appellants seem to contend that the Court's charge implied that unless Womack handed the dealer license plates to Heckstall with his hand there could have been no express consent, or in other words, Womack could not just motion to the plates, as Appellants herein contend was done at the time in question. Appellants' view of the Court's charge is entirely too narrow, and it is highly unlikely that the jury here took such a view which Appellants suggest. Assuredly, there was no plain error in the instructions. The supplemental charge as given was a correct definition of express consent and was in response to the jury's request. The express consent instruction, in balance, was more beneficial for the Appellants than Appellee.

The Virginia courts have defined express consent as "the permission * * * to be express * * * must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference." Hinton v. Indemnity Insurance Company, 175 Va. 205, 8 S.E.2d 279, 283 (1940). In the earlier opinion in this case, permission, express or implied, was a major premise that this Court desired to have pursued on a new trial. On retrial, the District Court followed closely and candidly the directions of this Court.

Additionally, Appellee herein insists that as to Appellants' objection to the trial court's instruction on express consent, the same was not as to the charge, but rather was asking that the trial court rule on the point as a matter of law, rather than to submit the issue to the jury. This contention raises two issues, namely that the objection to the

instruction was not sufficiently specific and that the trial court should have directed a verdict for Appellants herein. The second issue is later discussed, under the fourth contention urged by Appellants. Also, as to the supplementary charge, Appellee herein insists that Appellants' objection was too general in nature, and therefore in the absence of specific objections to the trial court, the court's instructions to the jury are not now reviewable.

■ As to the issues of objections to the trial court's instructions, in the case of Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943), the Supreme Court, in meeting the question of a general objection to instructions, said, "Where a party might have obtained a correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial," and at page 120, 63 S.Ct. at page 483, it is further said, "That rule cannot be avoided here by reason of the requested charge."

In concluding the assignment of error under consideration, there is no tenable basis for the contention that the trial court's instructions as to permission, express or implied, constituted prejudicial error to Appellants.

The second and third contentions raised by Appellants before this Court ask whether or not the trial court committed error in submitting to the jury, as an issue of fact, these inquiries: (1) Was the 1947 Pontiac automobile used principally in the business of Phillips Bros. Automoville; and, (2) did Womack intend to loan the dealer automobile license tags to Heckstall as a buyer.

■ The complete answer is found in the determination of this Court on the earlier appeal. The District Court on retrial followed closely the directions of this Court, on the earlier appeal, and appropriately submitted these factual issues to the jury under proper instructions.

The case of Wicker v. Nashville Surety, 330 F.2d 1009 (4th Cir. 1964), is a distinguishable situation from the matter at hand. In the *Wicker* case, the automobile dealer, pursuant to custom and agreement with purchasers of automobiles, undertook to complete the automobile transfer papers, including the reassignment of title certificate from the former owner, and to deliver same to the Director of Motor Vehicles, for the issuance of a new certificate of title to the purchaser. However, because of a holiday closing of the appropriate state office, this was not completed until after an automobile accident had occurred involving the recently purchased automobile while being operated by the purchaser. The dealer was found no longer to be the owner of the automobile but was merely acting as the purchaser's agent in completing the paper work incidental to the recorded ownership. The accident was not covered by the dealer's liability policy on the theory of permissive use by the purchaser.

United States Fidelity & Guaranty Co. v. Trussell, 208 F.Supp. 154 (W.D.Va. 1962), is also a comparable but distinguishable case. In this case a finance company, after repossession of an automobile, placed the same on a dealer's lot for resale. The person to whom the dealer was attempting to sell the automobile was held to be driving with implied permission, under the finance company's liability policy. Sale had not been completed at the time of the accident. In that case there was implied permission to any prospective purchaser to try out or demonstrate the automobile, but in the immediate case the jury found such permission lacking.

Noteworthy, also, is the case of United States Fidelity & Guaranty Corp. v. Myers Motors, 143 F.Supp. 96 (W.D.Va. 1956). In this case the automobile dealer had concluded the sale of an automobile. Virginia's title law required a transfer of certificate of title. Absent this element, title remained in the seller. Nevertheless it was held that the dealer's public liability garage policy, insuring the dealer against claims arising out of ownership of any automobile in connection with its automobile dealership, would cover claims arising out of an accident in which the buyer had become involved. In the immediate case, the legal title was in Phillips Bros. Automoville and the two factual issues are: Was the automobile used "principally" in the business of Phillips Bros. Automoville, and was the automobile used with the "permission" of the named insured. These issues distinguish the immediate case from the *Myers Motors* case, and as previously noted, under proper instructions, have been determined by the jury's verdict.

█ The final contention raised by Appellants herein asks whether or not the Court committed error in denying Appellants' motion for a directed verdict. For the reasons previously set forth in this opinion, and guided by the earlier, first appeal, opinion of this Court, we conclude that the trial court correctly overruled Appellants' motion for a directed verdict and properly submitted the issues of fact to the jury. There was ample conflicting testimony and interferences throughout the trial of this case, as appears from the record before us, to properly raise factual issues, which, under our system of jurisprudence, can only be effectively resolved by jury verdict.

█ Finally, it is deserving of note in this case that the findings of the jury are binding on an appellate court, if sufficient evidence to support them is found. The record on appeal in this case supports the district court's conclusion that Hardware Mutual Casualty Company presented evidence and inferences of such substance as to require the issues be submitted to the jury, and this Court cannot redetermine facts found by a jury. See Beaty Shopping Center v. Monarch, 315 F.2d 467 (4th Cir. 1963); Trout v. Cassco Corp., 191 F.2d 1022 (4th Cir. 1951); Miles v. Pennsylvania Railroad, 182 F.2d 411 (7th Cir. 1950); 1 B Moore's Federal Practice, Section 0.523(3) (n. 50) (1965).

■■ This Court, on this record, cannot say, as a matter of law, that the verdict was capricious, arbitrary and inconsistent. This Court cannot reverse the judgment in this case solely because we may be of the opinion that the jury should have returned a verdict opposite to the one presented to this Court in this appeal. It is the Seventh Amendment that fashions the federal policy favoring jury decisions of disputed fact questions. Byrd v. Blue Ridge Cooperative, 356 U.S. 525, 538, 539, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

The judgment of the District Court is affirmed.

Affirmed.